```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
WILLIAM FLEMM,                                                   :
                                                                 :
                              Plaintiff,                         :
                                                                 :      19 Civ. 11771 (JPC)
              -v-                                                :
                                                                 :         OPINION
VICTORY COMMERCIAL MANAGEMENT, INC.,                             :        AND ORDER
                                                                 :
                              Defendant.                         :
                                                                 :
-----------------------------------------------------------------X
```

JOHN P. CRONAN, United States District Judge:

William Flemm accuses Victory Commercial Management, Inc. ("Victory") of tricking him into quitting his job. Flemm claims he left his former job because he thought Victory was going to bring him on as its Chief Operating Officer, but then Victory never did. Flemm alleges equitable fraud, common law fraud, and negligent misrepresentation. Before the Court is Victory's motion for summary judgment. For the reasons discussed below, the Court grants Victory's motion.

## I. Background

### A. Factual Background

The following facts are undisputed unless otherwise noted. Beginning in 2013, Flemm worked as Senior Operations Manager at The Howard Hughes Corporation ("Howard Hughes"). Dkt. 61-3 at 21. Sometime in 2018, he began looking for a new job and eventually applied for the role of Chief Operating Officer at Victory. Dkt. 61-6 ¶¶ 1, 6; Dkt. 62-1 at 2 ¶¶ 1, 6. As part of the job application process, Victory asked Flemm to write a business proposal for the redevelopment of a certain Victory-owned property in China. Dkt. 61-6 ¶¶ 7-9; Dkt. 62-2 at 2 ¶¶ 7-9; *see also* Dkt. 62-2 at 18; Dkt. 61-5 at 20. Edward Liang, Victory's Managing Director, served as Flemm's main

contact during this time.  Dkt. 61-6 ¶ 2; Dkt. 62-1 at 2 ¶ 2.  Liang met with Flemm twice and acted as a liaison between Flemm and Victory's Board of Directors (the "Board").  Dkt. 61-6 ¶¶ 2, 6; Dkt. 62-1 at 2 ¶¶ 2, 6.  The Board "carried the decision-making authority with respect to whether or not to hire [Flemm]."  Dkt. 61-6 ¶ 3; Dkt. 62-1 at 2 ¶ 3.

On September 13, 2018, Liang sent Flemm an e-mail that stated in relevant part: "The company look [sic] forward to having you to act [sic] as its COO as soon as possible."  Dkt. 62-2 at 4.  Attached to this e-mail was an offer letter (the "September 13 Offer Letter").  *Id.* at 5.  This letter stated that Victory was "pleased to offer [Flemm] the full-time position of Chief Operating Officer" and noted that his "skills and experience will be a strong addition to [Victory's] team."  *Id.* at 5 ¶ 1.  Flemm did not sign this letter, *see id.*, and neither party relies meaningfully on it here.

Two weeks later, Liang sent Flemm an e-mail in which he said: "Please see the attached updated offer letter, hope it can bring you to be on board soon."  *Id.* at 18.  The offer letter attached to this e-mail (the "September 27 Offer Letter") was largely the same as the first one but included additional cash bonuses in the amount of $70,000 "paid every three months for the first 12 months of [Flemm's] employment."  *Id.* at 19 ¶ 5.  It also stated: "[Y]our starting date will be the time your business proposal is accepted by the Board of Directors."  *Id.* at 19 ¶ 3.  In other words, Victory's offer of employment was conditional and dependent on the Board's acceptance of Flemm's business proposal.  Dkt. 61-6 ¶ 7; Dkt. 62-1 at 2 ¶¶ 6, 7.  The letter also explained, "Your employment with Victory Commercial Management, Inc. is at-will and either party can terminate the relationship at any time with or without cause."  Dkt. 62-2 at 19.

According to the September 27 Offer Letter, this offer remained in effect until October 1, 2018.  *Id.* at 19.  Although Flemm submitted a signed copy of this letter to the Court, *see id.* at 20, the parties dispute whether he actually signed and delivered it to Victory before the offer expired.

2

While Flemm claims that he "hand delivered his signed acceptance of the [September] 27, 2018 offer letter" to Liang in New York City, Dkt. 62-1 at 2 ¶ 11, Victory says it "did not receive any copy of the signed offer letter before the October 1, 2018 deadline," Dkt. 61-6 ¶ 11; *see also* Dkt. 61-7 ¶ 3.  Regardless, the parties do not dispute that Flemm did not submit his business proposal by October 1, 2018, and therefore the Board could not have reviewed, let alone accepted, any proposal from Flemm by that deadline.

By October 7, 2018, Flemm still had not submitted his business proposal.  But on this day, he sent Liang an e-mail in which he stated that he was "thinking about [the] timing of [his] separation" from Howard Hughes and identified certain weeks as possible start dates at Victory. Dkt. 61-4 at 25.  Liang responded later that day and said, "[A]s you know[,] as we discussed before[,] once the business plan is fully accepted by the [B]oard you can please to be on board immediately [sic].  Hope you can understand." *Id.*

Flemm submitted his business proposal to Liang via e-mail on October 12, 2018.  *Id.* at 24. Twenty minutes after Flemm's e-mail, Liang confirmed receipt, Dkt. 61-4 at 8, and then on October 16, 2018, Liang sent Flemm the following e-mail (the "October 16 E-mail"):

> Hi William,
>
> The proposal looks good, it's easy to see that you made certain research on the project.  The [B]oard may provide comments later.  You know the [B]oard can't wait for too long time [sic].  Once they were aware that you completed it they want to take a look at first.  It has been translated into Chinese and to be [sic] provided to the [B]oard.  I will get back to you once they have any comments.
>
> Best,
>
> Edward

Dkt. 62-2 at 25.

Two days after receiving this e-mail, Flemm resigned from his job at Howard Hughes, even

3

though the Board had not accepted his business proposal and even though he therefore did not have a start date at Victory. Dkt 62-1 at 6 ¶ 17; Dkt. 62-3 ("Flemm Aff.") ¶ 13.[1] This also meant that Flemm left Howard Hughes prior to November 1, 2018, the exercise date for certain stock options that he held, specifically 1,000 shares of Howard Hughes stock. *See* Flemm Aff. ¶ 9; Dkt. 62-1 at 3 ¶ 4; Dkt. 63-1 ¶ 4.

Flemm and Liang corresponded for the next several weeks. Liang repeatedly told Flemm that the Board was reviewing Flemm's proposal. *See* Dkt. 61-4 at 7 ("[T]he [B]oard [is] reviewing the proposal."); *id.* at 6 ("[W]e are still waiting for [B]oard's comments[.]"). On November 20, 2018, and thus more than one month after Flemm had resigned from his prior employer, Liang informed Flemm that the "[n]ext step" would be a "video interview" between Flemm and the Chairman of the Board, *id.* at 5, which seems to have happened one day later, *see id.* at 3. On November 26, 2018, Flemm sent Liang an e-mail and stated that he was "looking forward to starting December 3rd." *Id.* That same day, Liang told Flemm that Victory was drafting a "formal employment agreement instead of the offer letter." *Id.* Flemm followed up about "the contract" on November 29, 2018. *Id.*

However, on December 21, 2018, Flemm received an e-mail from Victory's human resources department informing him that Victory chose not to hire him. *Id.* at 33. It stated that the Board had "decided to go in a different direction with respect to filling the position" and that "mainly due to unforeseen financial circumstances, [Victory] unfortunately ha[d] to put recruitment on hold until further notice from the [B]oard." *Id.* Although Flemm remained unemployed for a time, he appears to have eventually secured employment at another company. *See* Dkt. 1 ("Complaint" or "Compl.") ¶¶ 29-30.

---

[1] Some evidence in the record suggests that Flemm resigned on October 17, 2018, *see* Dkt. 61-4 at 30, but this discrepancy is immaterial.

**B. Procedural History**

On December 23, 2019, Flemm initiated this action against Victory. The Complaint alleges three claims—(1) equitable fraud; (2) common law fraud; and (3) negligent misrepresentation—and demands $400,000 in damages. *Id.* ¶¶ 6-47. With regard to damages, Flemm alleges that Victory specifically owes him: (1) $51,000, the amount of his annual Howard Hughes bonus that he would have received had he not resigned; (2) $116,280, the total value of Flemm's Howard Hughes stock options, based on the November 1, 2018 exercise price; (3) $41,000 in lost wages that he incurred after leaving Howard Hughes; (4) $14,503, the sum of Flemm's out-of-pocket medical expenses during the time he was unemployed; (5) $108,000, an amount Flemm alleges equals three years' worth of the difference between his compensation with Howard Hughes and his new salary, which is apparently less than he made at Howard Hughes; and (6) $70,000, a "payment" that he demands because he "was never compensated for the business proposal," he has charged this amount "for similar work," and he alleges that Victory used "information" he provided in the company's Form S-1, a Securities and Exchange Commission filing for companies planning on going public. *Id.* ¶¶ 28-31; *see also id.* ¶¶ 35-38, 43-46.[2]

Victory filed an answer on March 6, 2020, Dkt. 18, and discovery in this case closed on September 3, 2020, *see* Dkt. 50 at 2. This case was reassigned to the undersigned on October 30, 2020. The Court granted Victory leave to move for summary judgment, and the motion became fully briefed on January 11, 2021. However, the Court directed the parties to refile all papers in order to correct several deficiencies. Thus, Victory filed the operative motion for summary judgment on February 8, 2021. Dkt. 61. Flemm opposed the motion on February 15, 2021. Dkt. 62 ("Opposition"). Victory filed a reply on February 22, 2021. Dkt. 63.

---

[2] The itemized damages total $400,783, but Flemm only demands $400,000. Flemm does not explain this discrepancy.

## II. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). The burden then shifts to the nonmoving party who "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.*

"When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). Still, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to defeat a summary judgment motion. *Anderson*, 477 U.S. at 252. Instead, "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* In other words, "a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys*, 426 F.3d at 554 (internal quotation marks omitted). At bottom, the court must ask "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 553 (quoting *Anderson*, 477 U.S. at 252).

### III. Discussion

**A. Common Law Fraud**

Under New York law[3], the elements of common law fraud are: "(1) [the] defendant made a representation as to a material fact; (2) such representation was false; (3) [the] defendant[ ] intended to deceive [the] plaintiff; (4) [the] plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance [the] plaintiff sustained pecuniary loss[.]" *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 445-46 (S.D.N.Y. 2014) (quoting *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012)); *see also Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 488 (2007). Victory argues that it is entitled to summary judgment on Flemm's common law fraud claim (as well as the equitable fraud claim, discussed in the next section) primarily because the undisputed facts show that any purported representation relied upon by Flemm was not material or not false, there was no intent to defraud, and, in general, any offer of employment was conditioned on the Board's approval of Flemm's business proposal, which never occurred. Dkt. 61-2 ("Motion for Summary Judgment") at 11-14; Dkt. 63 at 2-3.

Although the Complaint alleges that Flemm was "misled over a period of time by false and incorrect representations and statements into resigning his executive position with [Howard Hughes]," *see* Compl. ¶ 3, it is difficult to determine from the Complaint the precise representations that form the basis of Flemm's claim. But in his Opposition, Flemm seems to identify four possible

---

[3] Neither party argues that anything besides New York law applies to this action. Because Flemm's "allegations seem to broadly track the elements of New York law[,] and because the parties both assume, for the purpose of this motion, that New York law applies," the Court applies New York law with regard to all of Flemm's causes of action. *AJ Energy LLC v. Woori Bank*, No. 18 Civ. 3735 (JMF), 2019 WL 4688629, at *5 n.10 (S.D.N.Y. Sept. 26, 2019) (internal quotation marks and alterations omitted); *see also Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) ("[W]here the parties agree that New York law controls, this is sufficient to establish choice of law.").

misrepresentations.  Opposition at 6-9.  As a matter of law, and construing the evidence in the light most favorable to Flemm, a "fair-minded jury" could not conclude that any of these was a false representation of material fact.

First, Flemm points to the September 27 Offer Letter.  Opposition at 6-8.  Rather than argue that individual statements in this letter were false, Flemm instead appears to say that the entire document was misleading because he did not know it was only a draft.  *Id.* at 7.  For this argument, Flemm draws on Liang's deposition testimony.  *See id.* at 6-7; *see also* Dkt. 62-1 at 6-7 ¶¶ 18-19, 22-23.  Liang stated during his deposition that the September 27 Offer Letter was a "draft," Dkt. 62-2 at 13, was not a "formal offer letter," *id.* at 15, and was "invalid" because no one from Victory signed it, *id.* at 16.  Liang also explained that a formal employment agreement would have followed this offer letter.  *Id.* at 13-15.  Flemm argues that Victory communicated none of this to him and thus "deceived" him into signing an offer letter "while knowing it was not a *bona fide* offer" but instead was a "meaningless piece of paper."  Opposition at 6; *see also id.* at 7; Flemm Aff. ¶ 15 ("Liang never told me that the offer letter that I signed was not an offer letter only a draft.").

Whether the September 27 Offer Letter was a draft is not material.  Either way, the letter explicitly provided that Flemm's business proposal had to be "accepted by the Board" before Flemm could start working at Victory.  Dkt. 62-2 at 19 ¶ 3.  To the extent Flemm argues that the language of the September 27 Offer Letter made it seem like the Board would inevitably accept his business proposal, and the only question was *when* this would happen, this fails.  Initially, this position would be nonsensical because the Board had not even seen Flemm's business proposal at the time Liang sent the September 27 Offer Letter since Flemm did not submit his proposal until October 12, 2018.  Dkt. 61-4 at 24.  Further, in his response to Victory's Rule 56.1 Statement, *see* Local Civil Rule 56.1, Flemm admitted that Victory's offer "was dependent on the acceptance of

8

[his] [b]usiness [p]roposal," Dkt 62-1 at 2 ¶ 7 (admitting the statement in Dkt. 61-6 ¶ 7), and that "[t]he Board ultimately carried the decision-making authority with respect to whether or not to hire [Flemm]," Dkt 62-1 at 2 ¶ 3 (admitting the statement in Dkt. 61-6 ¶ 3).  In his own statement of material facts, Flemm stated that "[o]ther than having his business proposal accepted by [Victory's] Board of Directors, the offer letter prepared by [Victory] and signed by [Flemm] contained no other condition to starting work."  Dkt. 62-1 at 4 ¶ 8; *see also id.* at 2 ¶ 6 (explaining that the offer letter "contained only one condition").  Flemm echoed this in his affidavit, explaining that he understood that "the only condition" of the September 27 Offer Letter was that he would not receive a start date until "after [his] business proposal [was] accepted by the Board."  Flemm Aff. ¶ 13; *see also* Opposition at 9 (explaining that the "only condition" in the September 27 Offer Letter was that Flemm "would receive his start date after his business proposal [was] accepted by the Board").  Flemm thus concedes that Victory's employment offer was conditioned upon the Board's acceptance of his business proposal.  Therefore, whether the September 27 Offer Letter was a draft is entirely immaterial.  Even if it was a "*bona fide* offer," it had a condition.  And that condition never came to fruition.

Flemm's version of the facts is made even harder to accept because Victory also emphasized the conditional nature of the offer after Liang sent Flemm the September 27 Offer Letter and before Flemm resigned from Howard Hughes.  On October 7, 2018, and more than one week before his resignation, Flemm attempted to finalize his start date at Victory.  Dkt. 61-4 at 25.  Liang responded later that day and said, "[A]s you know[,] as we discussed before[,] once the business plan is fully accepted by the [B]oard you can please to be on board immediately [sic].  Hope you can understand."  *Id.*  Liang thus would not entertain Flemm's request to finalize a start date, but instead again communicated that Victory could not begin Flemm's onboarding process until the Board

9

accepted Flemm's business proposal.[4]

Second, Flemm argues that the October 16 E-mail, Dkt. 62-2 at 25, included false representations of material facts. *See* Compl. ¶ 9; Opposition at 8. Flemm focuses on the portion of this communication in which Liang told Flemm that the business proposal Flemm had submitted four days prior "look[ed] good." *See* Compl. ¶ 9. Although Flemm alleges that this e-mail caused him to resign from Howard Hughes, he fails to offer any argument for why this statement was material or false. And the Court easily concludes that it was neither. Liang was not a member of the Board and did not purport to communicate the Board's opinion of Flemm's business proposal. His view of whether Flemm's submission "look[ed] good" was entirely irrelevant to whether Flemm would ultimately secure employment at Victory because the Board, not Liang, "carried the decision-making authority with respect to whether or not to hire [Flemm]." Dkt. 61-6 ¶ 3; Dkt. 62-1 at 2 ¶ 3. Thus, as a matter of law, Liang's statement was not material. Further, several courts have noted that an opinion "must be disbelieved [by the speaker] when spoken to be actionable under common law fraud in New York." *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 456 (S.D.N.Y. 2012) (collecting cases). Even if Liang's statement was material, there are no facts in the record that suggest Liang did not personally believe that Flemm's business proposal "look[ed] good." This statement cannot form the basis for Flemm's fraud claim.

Third, Flemm argues that he resigned "because [Victory] told him that it looked forward to him acting as Chief Operating Officer as soon as possible, and that the only condition [in] his offer letter which he was asked to sign was that he would receive his start date after his business proposal

---

[4] The dispute over whether Flemm signed and returned the September 27 Offer Letter to Victory, *see* Dkt. 62-1 at 2 ¶ 11; Dkt. 61-6 ¶ 11, is also immaterial. Construing these facts in the light most favorable to Flemm, and assuming he signed and returned the September 27 Offer Letter, the fact remains that this letter included a condition that required the Board to accept his business proposal before he could begin working at Victory. *See* Dkt. 62-2 at 19 ¶ 3.

[was] accepted by the Board." Opposition at 8-9. The Court assumes that this is a reference to Liang's e-mail dated September 13, 2018 in which he attached the September 13 Offer Letter that Flemm never signed. *See* Dkt. 62-2 at 4 ("The company look [sic] forward to having you to act [sic] as its COO as soon as possible."). Flemm again offers no explanation for why this statement was material or false, and he admits that despite receiving this communication and others, he "was never pushed to resign." Flemm Aff. ¶ 5 (internal quotation marks omitted). That Victory looked forward to having Flemm join the company "as soon as possible," 62-2 at 4, is not material and is also not inconsistent with the idea that the Board had to accept his business proposal, *see id.* at 19. Again, the parties do not dispute that the Board had final decision-making authority to hire Flemm, and hiring was contingent on the Board's acceptance of Flemm's business proposal, which Flemm had not even submitted at this point. Dkt 61-6 ¶¶ 3, 7; Dkt. 62-1 at 2 ¶¶ 3, 7.

Finally, Flemm claims that he "relied on the fact that agreement had been reached that he would be compensated if he left [Howard Hughes] before the Nov. 1, 2018 exercise date for his stock [options]." Opposition at 9. In other words, Flemm suggests that Victory wanted Flemm to quit his job with Howard Hughes before November 1, 2018 (for what reason, Flemm does not say). And to convince him to do this, Victory agreed to pay him bonuses that would exceed the value of the Howard Hughes stock options that Flemm would leave on the table by resigning before the options' exercise date.

Flemm has neither identified specific misstatements communicating this nor explained why they were false. The only evidence in the record suggesting that Victory added this bonus structure as an incentive for Flemm to resign from Howard Hughes is Flemm's unsubstantiated affidavit. *See* Flemm Aff. ¶¶ 9 ("Liang responded with an aggressive offer of an additional $70,000 to replace my loss [resulting from leaving prior to the exercise date of stock options]."), 13 (referring to an

"agreement having been reached that I would be compensated if I left the company before Nov. 1, 2018, exercise date for his [sic] stock"). The Court questions whether this would suffice as "hard evidence showing that [Flemm's] version of the events is not wholly fanciful." *Jeffreys*, 426 F.3d at 554 (internal quotation marks omitted); *see Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

But even accepting everything Flemm says as true, he does not raise a genuine dispute as to a material fact. *See* Fed. R. Civ. P. 56(a). Assuming "agreement had been reached" that Victory would pay Flemm additional bonuses to compensate him for the stock options that he would not be able to exercise by resigning from Howard Hughes prior to November 1, 2018, *see* Opposition at 9, this does not change the fact that Flemm's employment at Victory was conditioned on the Board accepting Flemm's business proposal. *See* Dkt 62-1 at 2 ¶ 7 (Flemm admitting this); Flemm Aff. ¶ 13 ("In reliance on Liang's e-mail of October 16, 2018 stating that my proposal 'looks good', and that the Board may provide comments later, and *the only condition [in] Victory's offer letter being that I would receive my start date after my business proposal is accepted by the Board*, and agreement having been reached that I would be compensated if I left the company before Nov. 1, 2018, exercise date for his [sic] stock, and being told that the company looked forward to him [sic] acting as Chief Operating Officer as soon as possible, on October 18, 2018, I resigned from my position as Senior Operations Manager with the Howard Hughes [sic].") (emphasis added). Thus even if Flemm resigned from Howard Hughes prior to November 1, 2018 because he thought he would earn higher compensation through the potential bonus structure, he admits that he did this "voluntarily," Dkt 62-1 at 2 ¶ 16 (admitting the statement in Dkt. 61-6 ¶ 16), "was never pushed to resign," Flemm Aff. ¶ 5 (internal quotation marks omitted), and understood that the offer was

"dependent on the acceptance of" his business proposal, Dkt. 62-1 at 2 ¶ 7 (admitting the statement in Dkt. 61-6 ¶ 7).  Flemm's common law fraud claim thus fails because a reasonable jury could not return a verdict for Flemm when there is no evidence in the record showing that Victory made a false statement of material fact.

The common law fraud claim—based on any of the statements discussed above—also fails for a separate, independent reason: a reasonable jury also could not conclude that Victory "intended to deceive" Flemm.  *See Special Situations Fund*, 33 F. Supp. 3d at 446.  To argue that a jury could find for him on this element, Flemm only points to Liang's deposition as "proof of fraud." Opposition at 6.  Liang's testimony shows no such thing.  Construing Liang's testimony in the light most favorable to Flemm, all it shows is that Victory failed to communicate to Flemm that it considered the September 27 Offer Letter to be a draft and that a more formal agreement would come later.  No evidence in the record suggests that Victory intended to deceive Flemm into quitting his job at Howard Hughes prior to the Board's acceptance of Flemm's business proposal and before Flemm had even submitted it.

In sum, Flemm has pointed to "a lack of evidence to go to the trier of fact," *Jaramillo*, 536 F.3d at 145, on multiple essential elements of common law fraud.  Flemm's attempt to "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial," *id.*, fails.  The Court thus grants Victory's motion for summary judgment as to Flemm's common law fraud claim.

## B.  Equitable Fraud

The legal authority supporting Flemm's "equitable fraud" claim is entirely unclear.  The only case that either party cites for this claim is *Kodak Graphic Communications Canada Co. v. E.I. du Pont de Nemours and Co.*, No. 08 Civ. 6553T (MAT) (MWP), 2011 WL 4711968 (W.D.N.Y. Sept. 23, 2011), *report and recommendation adopted*, 2011 WL 6826650 (W.D.N.Y.

Dec. 28, 2011). *See* Motion for Summary Judgment at 8; Opposition at 5-6. That case applied Delaware law and cited the Delaware Supreme Court for the proposition that "[e]quitable fraud differs from common law fraud in one respect—the defendant need not know that the representation is false." *Kodak Graphic*, 2011 WL 4711968 at *6 (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 115 (Del. 2006)).

In this Circuit, the concept of equitable fraud appears to arise primarily in cases under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, when one party asks the court for reformation of the terms of a benefits plan. *See, e.g.*, *Sullivan-Mestecky v. Verizon Commc'ns Inc.*, 961 F.3d 91, 103-04 (2d Cir. 2020); *Amara v. CIGNA Corp.*, 775 F.3d 510, 526-27 (2d Cir. 2014); *Osberg v. Foot Locker, Inc.*, 138 F. Supp. 3d 517, 557-58 (S.D.N.Y. 2015). The Court has serious doubts about whether "equitable fraud" is a cognizable cause of action under New York law and, if it is, whether it could afford a plaintiff damages, a remedy at law, or only equitable remedies, such as contract reformation. Nonetheless, the Court need not answer these thorny questions of state law because even if Flemm's understanding of the viability of an equitable fraud claim under New York law is correct, the claim fails. As with his claim for common law fraud, a reasonable jury could not "return a verdict for [Flemm] on the evidence presented," *Jeffreys*, 426 F.3d at 553, because no evidence in the record suggests that Victory made a false representation as to a material fact. Because Flemm fails to raise a genuine dispute of a material fact, the Court grants Victory's motion for summary judgment as to this claim too.

C. **Negligent Misrepresentation**

To prevail on a claim of negligent misrepresentation under New York law, a plaintiff must show that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was

14

incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012) (quoting *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)).  With regard to the first element, "New York strictly limits negligent misrepresentation claims to situations involving 'actual privity of contract between the parties or a relationship so close as to approach that of privity.'"  *Id.* (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 271 (2d Cir. 1993)); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014); *J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007).  For this claim, many courts applying New York law require a plaintiff to show that "the defendant owes [the plaintiff] a fiduciary duty."  *Turner v. Temptu Inc.*, No. 11 Civ. 4144 (JMF), 2013 WL 4083234, at *8 (S.D.N.Y. Aug. 13, 2013) (quoting *Prime Mover Cap. Partners, L.P. v. Elixir Gaming Techs., Inc.*, 793 F. Supp. 2d 651, 674 (S.D.N.Y. 2011)); *see also Stewart v. Jackson & Nash*, 976 F.2d 86, 90 (2d Cir. 1992).

While Victory argues that Flemm and Liang did not have a "special relationship," Motion for Summary Judgment at 16-17, Flemm claims one existed because Liang served as Managing Director of Victory, and that position "engendered confidence and trust."  Opposition at 10.  But "[c]ourts have routinely held . . . that the relationship between employer (or prospective employer) and employee is not fiduciary in nature and thus does not constitute a 'special relationship' for purposes of a negligent misrepresentation claim."  *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 327 (S.D.N.Y. 2012).

In *Cohen*, the court granted a motion to dismiss a negligent misrepresentation claim and rejected an argument that "as prospective employer of the [p]laintiff, the [d]efendants owed a duty

15

to the [p]laintiff to provide reliable and accurate information about the [defendant] company." *Id.* Similarly, in *Kwon v. Yun*, 606 F. Supp. 2d 344 (S.D.N.Y. 2009), the plaintiff alleged that the "defendants made various representations to induce him to accept their offers of employment and, those representations having proven to be false, caused him to suffer certain employment-related harms." *Id.* at 356. The Honorable Gerard E. Lynch granted the defendants' motion for summary judgment because "the employer-employee relationship does not constitute a special relationship sufficient to support a claim for negligent misrepresentation." *Id.*; *see also Metzler v. Harris Corp.*, No. 00 Civ. 5847 (HB), 2001 WL 194911, at *2 (S.D.N.Y. Feb. 26, 2001) (granting a motion to dismiss a negligent misrepresentation claim based on the allegation that the defendant "induc[ed] him to leave a secure job and accept employment at [the defendant] based on the representation that he would receive commissions for any business he generated"). Flemm's negligent misrepresentation claim is based on the fact that Victory was his prospective employer. Because this relationship fails as a matter of law, Flemm has not raised a genuine issue of material fact and has offered no evidence that Liang had "a duty . . . to give correct information." *Anschutz Corp.*, 690 F.3d at 114.

Finally, and even though Victory does not argue it, Flemm's negligent misrepresentation claim fails for an even more fundamental reason. As the Court has already concluded, Victory did not make a false representation to Flemm. *See id.* (explaining that negligent misrepresentation requires that "the defendant made a false representation").

Accordingly, the Court grants Victory's motion for summary judgment as to Flemm's negligent misrepresentation claim.[5]

---

[5] Because the Court concludes that each of Flemm's claims fail as a matter of law, it need not discuss at length the propriety of Flemm's alleged damages. However, it pauses to recognize the peculiarity of one of Flemm's requests for damages. Although most of Flemm's claimed losses stem from his early resignation, the $70,000 "payment" he requests for the work he did on the

## IV. Conclusion

For the reasons stated, Victory's motion for summary judgment is granted. All deadlines are adjourned. The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 61 and all other pending motions, enter judgment for Victory, and close this case.

SO ORDERED.

Dated: April 21, 2021
New York, New York

JOHN P. CRONAN
United States District Judge

---

business proposal is different. *See* Compl. ¶¶ 31, 38, 46. This seems to raise a different theory of fraud and negligent misrepresentation—that Victory duped Flemm to write a business proposal even though it never planned to hire him—but Flemm does not bring a separate cause of action based on this. If he had, the Court questions whether it would have even survived the pleading stage under the heightened standard of Rule 9(b) of the Federal Rules of Civil Procedure since the Complaint does not allege any facts particular to this theory. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). In all events, because the Court concludes that Victory is entitled to summary judgment on all claims, Flemm is not entitled to any damages, including this $70,000 payment.

17